IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

EDGAR RODRIGUEZ-ALEJANDRO,
a/k/a Temo, et al.

CRIMINAL CASE NO.

1:08-CR-363-TWT-RGV

## ORDER FOR SERVICE OF MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANTS' PRETRIAL MOTION

Attached is the Report and Recommendation of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. Cr. R. 58.1(A)(3)(a) and (b). Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within ten (10) days of receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. If no objections are filed, the Report and Recommendation may be adopted as the opinion and order of the District Court and any appellate review of

factual findings will be limited to a plain error review. <u>United States v. Slay</u>, 714 F.2d 1093, 1095 (11th Cir. 1983).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(F), **the above-referenced ten (10) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this 11th day of September, 2009.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

CRIMINAL CASE NO.

1:08-CR-363-TWT-RGV

EDGAR RODRIGUEZ-ALEJANDRO,
a/k/a Temo, et al.

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
ON DEFENDANTS' PRETRIAL MOTIONS**

Defendants Eder Jonathan Mora Quezadas ("Mora Quezadas"), Gustavo

Martinez ("Martinez"), David Gonzales, Jr. ("Gonzales"), Rodolfo Ibarra, Jr.

("Ibarra"), and FNU/LNU #2, a/k/a Pelon ("Pelon"), and other co-defendants, have

been charged with conspiracy to possess with intent to distribute cocaine and

marijuana, possession of at least five kilograms of cocaine with intent to distribute,

and money laundering. [Doc. 1]. These defendants have filed motions to suppress

evidence. [Docs. 242, 254, 256, 257, & 273].[1] After evidentiary hearings on the

---

[1] Mora Quezadas filed a motion to suppress search and seizure, [Doc. 242],
which Martinez adopted, [Doc. 254]. The motion originally sought to suppress all
evidence seized at 3241 Hamilton Road, Lawrenceville, Georgia, on May 13-14, 2008.
[Doc. 242]. An evidentiary hearing on the motion was initially held on February 24,
2009, [Doc. 358], but it was continued at defendants' request when the government
challenged defendants' standing, [id. at 3-6, 36-38], and prior to completing the
hearing, both defendants entered guilty pleas on all the counts against them, [Docs.
307 & 309]. On April 28, 2009, the Grand Jury returned a superseding indictment

motions,[2] the parties filed post-hearing briefs, [Docs. 301, 311, 323, 353, 357, 368, 377, & 385], and the motions are now ripe for ruling. For the following reasons, the undersigned **RECOMMENDS** that the motions to suppress, [Docs. 242, 254, 256, 257, & 273], be **DENIED**.[3]

---

charging Mora Quezadas and Martinez with knowingly possessing two firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). [Doc. 331]. The firearms were recovered from 3241 Hamilton Road when the defendants were arrested there on or about May 13, 2008. After the superseding indictment was returned, Mora Quezadas and Martinez renewed their motion to suppress, and a hearing was held on June 22, 2009, to address the issue of their standing to suppress the firearms. [Doc. 361].

[2] The evidentiary hearing transcripts will hereinafter be cited according to document number. [See Doc. 294 (transcript of the February 3, 2009, hearing on Pelon's motion); Docs. 358 & 365 (transcripts of the February 24, 2009, and June 22, 2009, hearings, respectively, on Mora Quezadas and Martinez's motions); Doc. 344 (transcript of the April 28, 2009, hearing on Gonzales and Ibarra's motions)]. The government submitted exhibits at the February 3, 2009, April 28, 2009, and June 22, 2009, hearings, which will be referred to as "Gov. Ex. ___," and Mora Quezadas and Martinez submitted exhibits at the June 22, 2009, hearing, which will be referred to as "Def. Ex. ____."

[3] Defendant FNU/LNU #2, a/k/a Tomas ("Tomas") filed a preliminary motion to suppress, [Doc. 250], and subsequently was granted an extension through January 27, 2009, to perfect or withdraw his motion. [Doc. 278 & Docket Entry dated 3/27/2009]. Defendant has not perfected the motion, and it is deemed abandoned and withdrawn.

# I. STATEMENT OF FACTS

**A.**   **Facts Relating to Gonzales and Ibarras' Motions to Suppress, [Docs. 256 & 273], and Mora Quezadas and Martinez's Motions to Suppress, [Docs. 242 & 254]**

### 1.   Surveillance of 3241 Hamilton Road and Initial Seizure

During the investigation leading to the charges in this case, the Drug Enforcement Administration ("DEA") obtained information through court authorized wiretaps that led agents to identify a residence at 3241 Hamilton Road, Lawrenceville, Georgia used by the targets as a drug money processing location. [Doc. 365 at 79-82]. During phone calls intercepted by the DEA ,the targets referred to the residence as "the office." For example, the DEA intercepted calls in which co-defendant Edgar Rodriguez-Alejandro, a/k/a Temo ("Temo") would tell his bosses in Mexico that he needed to go back to "the office" before he could provide information on how much drug money had been collected. [Doc. 344 at 5-6; Doc. 365 at 84]. DEA agents began conducting ground and aerial surveillance of 3241 Hamilton Road, Lawrenceville, Georgia in February 2008. [Doc. 365 at 64-65, 68].

In April 2008, the DEA learned through its wiretap investigation that Temo was going to receive orders from his boss in Mexico to contact a certain truck driver and deliver approximately $4.7 million to the driver to transport to Mexico on April 8, 2008. [Doc. 344 at 5-7]. Temo contacted the truck driver on April 8, and, using

coded language, they agreed to meet at a Quick Trip gas station off of exit 96 (Pleasantdale Road) on I-85. [Id. at 7]. That same day, surveillance at 3241 Hamilton Road revealed suspects placing three suitcases into a Chevrolet Astro van. [Id. at 7-8; Doc. 365 at 72]. The van, a white Ford Ranger pickup truck, and a silver Chevrolet Impala departed the residence, and the van and pickup truck were surveilled to a warehouse located off of Oakcliff Industrial Boulevard. [Doc. 344 at 8-9; Doc. 365 at 66-67, 72]. The Impala driver met up with the driver of a tractor-trailer at the Quick Trip, and the tractor-trailer followed the Impala to the warehouse, where agents observed three suitcases being transferred to the tractor-trailer. [Doc. 344 at 8-9; Doc. 365 at 66-67, 72-73]. The tractor-trailer then departed the warehouse, and agents maintained surveillance on it. A few hours later, the Georgia State Patrol conducted a traffic stop of the tractor-trailer in LaGrange, Georgia, and seized approximately $4.7 million dollars hidden in the suitcases in the trailer. [Doc. 344 at 9-11; Doc. 365 at 65, 69]. The suitcases had duct tape and orange spray paint on their exterior and were secured with padlocks instead of the type of locks normally used on suitcases. [Doc. 365 at 66-67, 76-77, & Gov. Ex. 29].[4]

After the April 8 seizure, agents intercepted a phone call in which the targets received instructions from Mexico to begin sending out smaller amounts of money,

---

[4] After the delivery of the suitcases to the tractor-trailer, Rodriguez-Alejandro reported back to Mexico that the $4.7 million was on its way. [Doc. 344 at 10].

in increments of approximately $1 million dollars, because the drug organization did not want to risk having such a large amount of money seized again. [Id. at 70]. On April 16, 2008, the DEA observed the same three vehicles involved in the April 8 exchange leave 3241 Hamilton Road and go to Oakcliff Industrial Boulevard. The agents learned, based on an intercepted call and surveillance, that approximately $1 million dollars was transferred from the Impala to a tractor-trailer that day. [Id. at 66-67, 71-72]. DEA maintained surveillance as the tractor-trailer carried the money to Texas and crossed the border into Mexico. [Id. at 71]. The DEA observed nearly identical transactions occur again on April 18, April 21, and May 9, 2008, all featuring the vehicles departing from 3241 Hamilton Road and going to the warehouse, where a suitcase with approximately $1 million was transferred from one of the vehicles to a tractor-trailer each time. [Id. at 72-75].

### 2. Seizure of Evidence from Tractor-Trailer on April 22, 2008

On April 20 and 21, 2008, agents learned through wiretaps that $1.2 million was going to be delivered to a tractor-trailer driver. [Doc. 344 at 11-12, & Gov. Exs. 1-18]. On the evening of April 20, Temo and the truck driver discussed Temo turning in "some books," which agents understood to be a coded reference to U.S. currency, and that it would have to happen the next day between 6:30 and 7:00 p.m. because the warehouse was not available that night. [Id. at 12-14, & Gov. Exs. 1-2].

On April 21, at 3:08 p.m., the truck driver advised Temo that he was ready, and Temo told the truck driver to meet him at the "red drop," a Quick Trip gas station, off of exit 96 on I-85, and Temo said he would lead the driver to the location where he needed to go.[5]  [Id. at 7, 14, & Gov. Ex. 3].

At approximately 6:17 p.m. on April 21, Temo had a conversation with Chuki, the individual who had the keys and access to the warehouse, to advise him of when Temo was going to arrive at the warehouse and to confirm that Chuki would be there.  [Id. at 15-16, & Gov. Ex. 5].  Agents were conducting surveillance of 3241 Hamilton Road and observed individuals loading a suitcase into the white Chevy Astro van, then they saw the van, the white pickup truck, and the silver Impala depart the residence.  [Id. at 7-8, 17, & Gov. Ex. 18A].

At approximately 6:53 p.m., Temo advised Chuki that he was close to the warehouse, and Chuki said that he would be at the warehouse shortly.  [Id. at 18, & Gov. Ex. 8].  Agents conducting surveillance of the Quick Trip gas station saw the silver Impala arrive, and agents intercepted a telephone call in which the truck driver said he spotted Temo and Temo then directed the truck driver to follow him. [Id. at 19, & Gov. Ex. 10].  The truck driver, who was driving a flatbed tractor-trailer, departed the gas station, following Temo in the Impala.  Temo provided the truck

---

[5] Temo also referred to the Quick Trip station as "little Q."  [Doc. 344 at 14].

6

driver directions to the warehouse over the phone, and in one of their conversations, Temo said that he noticed that the driver did not have a "box" on the flatbed trailer and inquired where he was "going to put [it]." [Id. at 20-21, & Gov. Exs. 11-15]. The truck driver advised Temo that he would put "it" under the tarp and that he had done so previously. [Id. at 21]. Temo then called Chuki to advise him that he was at the warehouse, and Chuki stated that he would be there in a minute. [Id. at 22].

Surveillance agents had seen the Chevy Astro van arrive at the warehouse, and two individuals in that vehicle unloaded a large suitcase. [Id. at 27, 49-50]. After the Impala and tractor-trailer arrived, the suitcase was placed under a tarp on the flatbed trailer, at the front near the tractor. [Id. at 27, 40, 50-53]. After the suitcase was secured, the tractor-trailer departed with two occupants. [Id. at 23-24, 51-53]. At approximately 7:26 p.m., Temo advised an individual who worked in the drug trafficking organization in Atlanta that "it was done," [id. at 23, & Gov. Exs. 16-17], and at 11:00 p.m., Temo called the accountant in Mexico, who kept track of drugs distributed and money collected, and told him that $1,195,500 was on its way. [Id. at 24-25, & Gov. Ex. 18].

Agents from Atlanta maintained surveillance on the tractor-trailer from the warehouse to Lafayette, Louisiana, where agents from Houston, Texas, took over surveillance at approximately 12:30 or 1:00 p.m. on April 22, 2008. [Id. at 25-26, 54-

57, & Gov. Exs. 19-22]. The agents believed that the money in the suitcase was being taken to Texas and then to Mexico, as had occurred approximately two weeks earlier with another suitcase loaded into a tractor-trailer at the same warehouse. [Id. at 27-28]. The Houston agents maintained surveillance until the tractor-trailer was on I-10 in Fort Bend County, Texas,[6] where the tractor-trailer was stopped by Patrol Sergeant Michael Waller ("Sgt. Waller") of the Fort Bend County Sheriff's Office for traffic violations. [Id. at 55-56, 58-64, 69-70, & Gov. Exs. 19-20, 25].[7]

Sgt. Waller observed that the tractor-trailer had an obscured license plate, and air hoses for the brakes of the trailer were not being properly suspended and thus were rubbing against the frame of the tractor, which could cause damage to the hoses resulting in brake failure. [Id. at 61-64, 91-93, & Gov. Exs. 22, 24-26, 31]. After observing these infractions, Sgt. Waller activated the blue lights on his marked patrol car and pulled over the tractor-trailer. [Id. at 60, 63-64]. Sgt. Waller walked to the rear of the trailer and indicated for the driver to exit the vehicle and come back to where Sgt. Waller was standing. The driver, defendant Gonzales, complied, and

---

[6] Nothing was removed from the trailer while the agents were surveilling it. [Doc. 344 at 24-26, 28, 41, 54-57].

[7] Atlanta agents were in contact with the Houston DEA concerning turning over surveillance to Houston, and Houston DEA was in turn in contact with the Fort Bend County Sheriff's Office and Sgt. Waller concerning the request for a traffic stop of the tractor-trailer if independent probable cause could be established. [Doc. 344 at 59-60].

Sgt. Waller asked him where he was coming from. Gonzales replied "Georgia," but he did not know which city in Georgia. [Id. at 64]. Sgt. Waller then asked Gonzales what he was hauling and if he had his bill of lading and logbook, and Gonzales stated that he did not know what he was hauling and had left the bill of lading and logbook in the cab of the tractor when he exited to talk with Sgt. Waller. [Id.].

Sgt. Waller became suspicious because Gonzales did not bring the bill of lading with him, did not know where he had come from in Georgia, and did not know what he was hauling, so Sgt. Waller left Gonzales with another deputy who had arrived on the scene and went to talk to the passenger, defendant Ibarra. [Id. at 64-65, 93]. Sgt. Waller talked with Ibarra as they stood next to the passenger door of the tractor. [Id. at 65]. Ibarra likewise said they were coming from Georgia, but he could not identify the city. When Sgt. Waller asked what they were hauling, Ibarra first stated he did not know, but then said it was some kind of paint. [Id.]. Sgt. Waller noticed that as he asked Ibarra questions, he appeared to be nervous and would look toward the back of the trailer, as if trying to make eye contact with Gonzales. [Id.]. Sgt. Waller then asked if there was anything illegal in the truck, and after looking at the trailer and attempting to look back at Gonzales, Ibarra responded that there was not. [Id. at 65-66].

Sgt. Waller then returned to Gonzales and asked if he owned the truck, and Gonzales responded that he owned the truck but not the trailer. [Id. at 66]. Sgt. Waller asked if there was any contraband on the truck, and Gonzales responded no and volunteered that Sgt. Waller could check whatever he wanted. [Id.]. Sgt. Waller then asked for consent to search, and Gonzales responded that Sgt. Waller could search whatever he wanted. [Id.]. Sgt. Waller confirmed the verbal consent and began searching the trailer. [Id.]. At the front of the trailer, Sgt. Waller discovered the large suitcase under the tarp and asked Gonzales what was inside it. [Id. at 67]. Gonzales said a dead body was in the suitcase. [Id.]. Sgt. Waller then opened the suitcase and found bundles of U.S. currency wrapped in plastic. [Id. at 68, & Gov. Ex. 24]. Approximately $1,194,017 was seized from the suitcase, which had been placed on the tractor-trailer at the warehouse in Atlanta. [Id. at 25].

### 3. Seizures at 3241 Hamilton Road

On or about May 13, 2008, officers of the Gwinnett County Police Department ("GPD") arrested Mora Quezadas and Martinez and two other suspects at 3241 Hamilton Road. [Doc. 365 at 18, 32].[8] Another suspect avoided arrest by fleeing from the premises. [Id. at 32]. GPD Investigator Scott Kannigiser ("Investigator

---

[8] One of the arrestees was co-defendant Temo, who did not file a brief on the standing issue and has therefore abandoned the motion to suppress. [Doc. 377 at 6 n.2].

Kannigiser"), the case agent for the arrest, described the following evidence recovered during a subsequent search of the residence:

1.     The attic contained 30-35 suitcases and packages filled with approximately $7.6 million in U.S. currency, the money having been vacuum sealed and wrapped in rubber bands; and a suitcase containing 12 kilograms of cocaine;

2.     The attic and bonus room contained three money counters, food saver bags, and two food saver machines, which Investigator Kannigiser explained are used to vacuum seal packages of money;

3.     The downstairs living area contained packages of brass master padlocks and cell phones, in addition to a hand gun located in the cushions of the couch.[9]

4.     A shelf in the laundry closet held three rolls of silver duct tape and a can of orange spray paint.

5.     The kitchen cabinets contained a calculator and several business ledgers for documenting the collection of money.

[Id. at 35-42, 76, 81, & Gov. Exs. 11-13, 19-23, 28].

**4.     Evidence Relating to Defendants' Ties to 3241 Hamilton Road**

At the February 24, 2009, evidentiary hearing, Mora Quezadas testified that he had been staying at 3241 Hamilton Road for approximately one week before he was arrested there on May 13, 2008, and he did not know how long he would have continued to stay there.  [Doc. 358 at 15].  He did not have any agreement to pay rent

_____

[9] The other handgun was reportedly found in one of the bedrooms, [Doc. 365 at 9], but the record does not demonstrate whether it was one of the bedrooms the defendants occupied.

and had access only to his bedroom, a bathroom, the living room, the kitchen/dining room, and the garage area that had been converted into a recreation room containing a pool table. [Id. at 17, 23-26]. Mora Quezadas testified at the June hearing that he sometimes ate meals at the house and sometimes cooked in the kitchen, and he had watched TV and played pool in the house. [Doc. 365 at 47-48]. Mora Quezadas also identified photographs of the bedroom where he had been sleeping, which depicted clothing and a suitcase. [Id. at 47, & Def. Exs. 19-21]. Mora Quezadas testified that defendant Martinez also slept at the house, ate some meals there, and played pool in the house. [Id. at 48].

Mora Quezadas testified that he had another residence in May 2008 besides 3241 Hamilton Road, but he could not identify the location of that residence because he had only been in the area a short time and was not familiar with the streets or neighborhoods. [Id. at 60-61]. He testified that he was staying at 3241 Hamilton Road because he was going to be leaving the area soon to travel with his family. [Id. at 61]. Martinez submitted into evidence an affidavit which stated that on May 13, 2008, he resided at 3241 Hamilton Road and had been a resident at that address for approximately one week. [Doc. 365, Def. Ex. 1].

At the June 2009 hearing, the photographs defendants introduced of the interior of 3241 Hamilton Road depicted a furnished, single-family home with

clothes in bedrooms and other rooms and food in the refrigerator and pantry, as well as some personal items belonging to a woman and child. [Id. at 19-28, & Def. Exs. 2-21]. Paperwork with Martinez's name on it was also found upstairs in the first bedroom on the right, but Investigator Kannigiser did not know the nature of the paperwork, how it came to be there, or how long it had been there. [Id. at 29-30, 33]. Investigator Kannigiser likewise did not know if any of the defendants had a key to the house, and there was no other evidence that the defendants had keys or the right to exclude others. [Id. at 33]. Investigator Kannigiser testified that when entry was made, a male left the residence and evaded arrest, and aside from defendants Martinez, Mora Quezadas, and Temo, a woman was also arrested at 3241 Hamilton on May 13. [Id. at 32]. Investigator Kannigiser testified that, in his experience, there was nothing unusual about a Mexican drug organization using a single-family residence as a stash house or a money processing house. [Id. at 34].

## B. Facts Relating to FNU/LNU #2, a/k/a Pelon's Motion to Suppress, [Doc. 257]

The indictment in this case was returned on September 10, 2008. [Doc. 1]. On September 15, 2008, DEA Special Agent Curt Fallin ("Agent Fallin") held meetings with various state and federal officers about the coordinated execution of multiple arrest and search warrants in this case that were to occur the following day. [Doc. 294 at 11-12]. Agent Fallin provided defendant Pelon's arrest warrant to agents

assigned to make his arrest, and DEA Task Force Officer David Noe briefed the agents about Pelon's residence at 1014 Sweetwater Road in Lawrenceville, Georgia, as well as a black Honda associated with Pelon. [Id. at 13-14].

Surveillance and wiretap telephone calls that occurred between September 4 and September 15, 2008, demonstrated a close association between Pelon and defendant Jose Luis Hernandez ("Luis") and indicated that Pelon was involved with drug trafficking on "a major level," that Pelon was connected to a black Honda that had been seen at one of Luis' houses and at 1014 Sweetwater Road, and that the Sweetwater residence was Pelon's or his girlfriend's or wife's. [Id. at 3-10, 15-16, 21-23]. Agents surveilled the Sweetwater residence from 6:30 p.m. to 10:00 p.m. on September 15, and a BMW and black Honda were parked at the house when surveillance began and ended. [Id. at 15-16, 23]. Agent Fallin testified that agents were not aware of any job or employment that Pelon had as of September 15, 2008, and that there was no reason to suggest that Pelon would not be at his residence early in the morning the next day. [Id. at 15].

DEA Task Force Officer Kevin Krueger ("Officer Krueger") was involved in the execution of the arrest warrant for Pelon on September 16, 2008. [Id. at 28]. Just before 8:25 a.m. that day, Officer Krueger arrived at the Sweetwater house with 12 to 15 agents. [Id. at 30]. The agents parked some distance from the house so they

could make a tactical approach, since they thought people inside could be awake by 8:30 a.m. [Id. at 31-32]. Officer Krueger saw a black Honda parked at the Sweetwater house, which matched the description of the car that the other DEA group had seen there the night before. [Id. at 31]. Agents knocked and announced their presence, waited approximately 20 to 30 seconds for someone to answer the door, then knocked and announced again before forcibly opening the door to the house. [Id. at 32, 40-41].

Officer Krueger led the group in with a barricade, and as the agents cleared the house room by room, they approached a locked master bedroom door, broke it down, and found defendant Pelon and a woman in the bed inside the room. [Id. at 33-34]. The bedroom contained a king-sized bed, and Officer Krueger testified that the room was "not very big" and had a "wall to wall bed." [Id. at 34]. As agents entered the room, they saw four cellular telephones in the bedroom. [Id. at 34, 38, 50]. One phone was lying on the night stand to the right of the bed, one was lying on the floor to the right of the bed, and two were lying on the floor to the left of the bed. [Id. at 34-35].

Officer Krueger testified that when agents entered the room or took a few steps into the room, all four phones were visible to them, and that Pelon could have grabbed or accessed all four of the phones from where he was situated when agents

found him.  [Id. at 35, 37, 47].  Agents called out the fact that there were phones in

the room, and Officer Krueger immediately recognized the phones as evidence of

criminal conduct and testified that he and the members of his group were aware of

the importance of phones in a drug and wiretap investigation:

> I mean they're a phone group.  We're a phone group.  I mean the
> phones are a viable source of our intel, and during the course of
> various investigations or arrests, there's always a concerted effort by
> the part of the defendants many times to destroy the phones, either
> remove the SIM cards or disassemble them where agents don't have
> access to the phones.

[Id. at 35-36, 50].

Agents did a quick "wingspan search," or protective sweep, of the area within

Pelon's reach, including the area under the bed.  [Id. at 36-37].  During this search,

all four phones would also have been visible to the agents.  [Id. at 37-38].  Officer

Krueger quickly looked inside the bedroom while agents were ordering Pelon out

of bed.  Pelon was handcuffed while inside the bedroom and then brought into the

kitchen area, and the entire encounter in the bedroom lasted "a matter of seconds."

[Id. at 45-47].  While agents took a voice exemplar from Pelon in the kitchen, Officer

Krueger seized the four phones from the bedroom area, which was "within five

minutes" of agents encountering Pelon.  [Id. at 38].  According to Officer Krueger,

the phones were not seized while agents were in the bedroom with Pelon because

"the most important thing was to get him secured, get everybody in the house that was in there secured."  [Id. at 49].[10]

## II. DISCUSSION

### A.  Gonzales and Ibarra's Motions to Suppress, [Docs. 256 & 273]

Gonzales and Ibarra assert that the tractor-trailer they were traveling in on April 22, 2008, was stopped without probable cause and that the police unlawfully searched the vehicle and lacked consent to do so.  [Docs. 256 & 273].  The government argues that probable cause to search the tractor-trailer existed due to the collective knowledge of all of the participating law enforcement officers at the time of the traffic stop, and, alternatively, that Sgt. Waller had independent probable cause to stop the vehicle for traffic violations he observed, and that Gonzales gave him consent to search the tractor-trailer and suitcase.  [Doc. 363].  Defendant Gonzales responds that probable cause was lacking because the evidence was indicative of mere presence at a crime scene and among criminal suspects and nothing more, and that the traffic stop was a pretext to investigate the suspected drug trafficking crime.  [Doc. 357 at 4-5].[11]  Gonzales also argues that his consent to

---

[10] Agents testified that they did a protective sweep to make sure there were no other subjects in the bedroom because "there [were] like 13, 14 of us inside that house in a small area."  [Doc. 294 at 36].

[11] Because defendant Ibarra has not filed a post-hearing brief, he is deemed to have abandoned his motion.  Nevertheless, the Court's discussion of Gonzales'

search was invalid because it was the product of an illegal stop and not voluntary. [Id. at 9-11].

## 1.    Legality of Search Based on Traffic Stop and Consent

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." Whren v. United States, 517 U.S. 806, 809-10 (1996). Therefore, an automobile stop is "subject to the constitutional imperative that it not be unreasonable under the circumstances." Id. at 810 (internal marks omitted).

"[A] traffic stop is a constitutional detention if it is justified by reasonable suspicion under Terry [392 U.S. at 30, that 'criminal activity is afoot,'] or probable cause to believe a traffic violation has occurred under Whren . . . ." United States v. Chanthasouxat, 342 F.3d 1271, 1275 (11th Cir. 2003). Probable cause must be supported by more than a mere suspicion, but does not require the same "standard of conclusiveness and probability as the facts necessary to support a conviction." United States v. Dunn, 345 F.3d 1285, 1290 (11th Cir. 2003). Reasonable suspicion is

---

motion demonstrates that Ibarra's motion also fails on the merits.

a less demanding standard than probable cause and requires only a fair probability that illegal activity has occurred.  United States v. Sokolow, 490 U.S. 1, 7 (1989); United States v. Arvizu, 534 U.S. 266, 274 (2002) (citation omitted) (reasonable suspicion is not formed on a "mere hunch").

In examining the existence of probable cause and reasonable suspicion, the Court looks at the totality of the circumstances confronting the officer.  United States v. Trullo, 809 F.2d 108, 111 (1st Cir. 1987).  See also Arvizu, 534 U.S. at 273-74.  Subjective intentions and motivations are irrelevant, as an officer must have a "particularized and objective basis for suspecting legal wrongdoing."  United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (quoting Arvizu, 534 U.S. 266); Chanthasouxat, 342 F.3d at 1279-80; United States v. Meyer, 20 Fed. App. 808, 813 (10th Cir. 2001) (unpublished); United States v. Lopez-Valdez, 178 F.3d 282, 288 (5th Cir. 1999).  Where the investigative stop is performed by an officer at the direction of other officers, the Court must examine the collective knowledge of all of the officers in determining whether there existed reasonable suspicion.  Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568 (1971); see also United States v. Mikell, 102 F.3d 470, 474-75 (11th Cir. 1996).  It is the government's burden to demonstrate that the officer had such a basis before initiating the stop.  See Welsh

v. Wisconsin, 466 U.S. 740, 749-50 (1984); United States v. Tobin, 923 F.2d 1506, 1517 n.21, 1520 (11th Cir. 1991) (*en banc*) (Clark, J., dissenting).

Gonzales argues that the traffic stop resulting in the seizure of the suitcase was illegal because it "did not relate to and lasted longer than was necessary to investigate [the] traffic violations that were the purported reason for [the stop] in the first place." [Doc. 357 at 6]. Defendants have not contested that the obscured license plate and the failure to properly suspend the air hoses for the trailer's brakes constituted traffic violations,[12] [Doc. 357 at 3, 6], and whether the traffic stop was motivated by a desire to investigate other criminal activity is irrelevant, since all Sgt. Waller needed was a "particularized and objective basis for suspecting legal wrongdoing." Lindsey, 482 F.3d at 1290; see also Chanthasouxat, 342 F.3d at 1279-80; Meyer, 20 Fed. App. at 813; Lopez-Valdez, 178 F.3d at 288.

---

[12] Section 502.409(a) of the Texas Transportation Code provides that "[a] person commits an offense if the person attaches to or displays on a motor vehicle a number plate or registration insignia that . . . has blurring or reflective matter that significantly impairs the readability of the name of the state in which the vehicle is registered or the letters or numbers of the license plate number at any time; or . . . has a coating, covering, protective material, or other apparatus that . . . distorts angular visibility or detectability . . . or . . . alters or obscures the letters or numbers of the license plate number or the color of the plate." Tex. Transp. Code § 502.409(a). The government has not provided a statutory citation in reference to Gonzales' failure to properly suspend the air hoses on the vehicle, but Sgt. Waller testified that this was constituted an "unsafe condition" and was "definitely a safety violation of improper vehicle, maintaining a safe operable vehicle." [Doc. 344 at 63, 90].

The Supreme Court in <u>Whren</u> held that the constitutional reasonableness of the traffic stop does not depend on the actual motivation of the police officers involved. 517 U.S. at 813; <u>see also</u> <u>United States v. Holloman</u>, 113 F.3d 192, 194 (11th Cir. 1997) ("[t]he [<u>Whren</u>] decision conclusively refutes the notion that ulterior motives may invalidate police conduct that is justified on the basis of probable cause to believe that a violation of law has occurred"); <u>United States v. Simmons</u>, 172 F.3d 775, 778 (11th Cir. 1999) ("an officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment," and there was no basis to question the district court's finding that "there was no question that the officers had observed [defendant] run the stop sign and, therefore, had probable cause to stop [defendant's] automobile") (internal marks and citation omitted). Therefore, Gonzales' argument that the traffic stop was pretextual because Sgt. Waller had "received information from other officers [that] the vehicle was suspected of carrying drugs and those officers requested the arresting officer to [develop] independent probable cause to stop defendant's vehicle," and because Sgt. Waller testified that when he first stopped the vehicle, he already "believed defendant was violating the law notwithstanding any traffic violations that might occur as he pursued defendant," [Doc. 357 at 6-7 (<u>citing</u> Doc. 344 at 59-61, 82-83)], is without merit. There is no dispute that Sgt. Waller actually

observed the tractor-trailer committing two traffic violations and therefore had probable cause to stop the vehicle.

Even though an officer may have justification to initiate a traffic stop, the ensuing detention of a vehicle's occupant must not be excessively intrusive in that the officer's actions "must be reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)). See also United States v. Cantu, 227 Fed. App. 783, 785 (11th Cir. 2007) (unpublished). The stop must be of limited duration and may not last "'any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity.'" United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (quoting Holloman, 113 F.3d at 196). The duration of the traffic stop "must be limited to the time necessary to effectuate the purpose of the stop." Id. The legality of a detention following a traffic stop may be jeopardized if an officer improperly extends its duration. United States v. Hernandez, 418 F.3d 1206, 1209 n.3 (11th Cir. 2005) (in light of Muehler v. Mena, 544 U.S. 93, 100-01 (2005), the proper focus is on the duration of the stop, not the scope of questioning).

Gonzales claims that the duration of the detention exceeded the permissible scope of the traffic stop based on the circumstances that led to the stop in the first

place, since the "entire detention lasted about ten minutes," Sgt. Waller testified that "the real purpose for stopping [Gonzales] was to [develop independent] probable cause and investigate the truck to determine if it carried drugs or money," and once Sgt. Waller finished writing the traffic warning, the traffic investigation was complete. [Doc. 357 at 8; Doc. 344 at 82-84, 86]. However, the government argues that Sgt. Waller had reasonable suspicion that Gonzales was engaging in or about to engage in a crime and therefore could lawfully detain him for a period to investigate. [Doc. 353 at 15].

Where the initial traffic stop is legal, the officer has "'the duty to investigate suspicious circumstances that then [come] to his attention.'" United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991) (quoting United States v. Hardy, 855 F.2d 753, 757 (11th Cir. 1988)). Police are "entitled under the decisional law to conduct a variety of checks on the driver and his car, including questioning the driver about the traffic violation, requesting consent to search the car, and running a computer check for outstanding warrants." Simmons, 172 F.3d at 778 (emphasis omitted). Moreover, insofar as officers are conducting a valid traffic stop, the officers are also permitted to order the suspect to exit the vehicle. Maryland v. Wilson, 519 U.S. 408, 414-15 (1997); Pennsylvania v. Mimms, 434 U.S. 106, 110-11 & n.6 (1977).

Sgt. Waller had a valid basis for stopping the tractor-trailer based on the traffic violations he observed, and he had "the duty to investigate suspicious circumstances that then [came] to his attention." Harris, 928 F.2d at 1117. Sgt. Waller was authorized to order Gonzales out of the vehicle and to question him about his operation of the tractor-trailer, including asking to see his bill of lading and logbook. Gonzales' answers to Sgt. Waller's questions, including that he did not know what he was hauling or the city from which his trip originated, combined with Ibarra's nervousness and multiple glances toward Gonzales, provided ample reasons for Sgt. Waller to extend the stop to further investigate, particularly given Sgt. Waller's knowledge of how the tractor-trailer was connected to the surveillance that had started in Atlanta.[13] Moreover, Gonzales concedes that the "entire detention lasted

_____

[13] Gonzales cites United States v. Tapia, 912 F.2d 1367, 1371 (11th Cir. 1990), to argue that the answers he and Ibarra gave to the police "were typical of . . . out of state individuals confronted by law enforcement." [Doc. 357 at 9]. The court in Tapia found that "the factors cited by the district court . . . e.g., being Mexican, having few pieces of luggage, being visibly nervous or shaken during a confrontation with a state trooper, or traveling on the interstate with Texas license plates . . . do not provide a minimal, particularized basis for a conclusion of reasonable suspicion on the part of [the officer]." 912 F.2d at 1371. However, the totality of the circumstances here differ from those in Tapia. As discussed, Sgt. Waller was aware that the tractor-trailer was suspected of being involved in drug trafficking and was under surveillance by DEA agents at the time he initiated the stop. Gonzales' claim that he did not know what he was hauling or the city in Georgia from which he departed, combined with Ibarra's similarly evasive answers to Sgt. Waller's questions, provided reasonable suspicion to extend the stop.

about ten minutes," [Doc. 357 at 8], which was certainly reasonable under the circumstances.

The subsequent search of the vehicle and suitcase was lawful pursuant to Gonzales' voluntary consent. "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989). See also Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Reynolds, 526 F. Supp. 2d 1330, 1336 (N.D. Ga. 2007). "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." Garcia, 890 F.2d at 360.

The government bears the burden of proving that consent was voluntary, United States v. Tovar-Rico, 61 F.3d 1529, 1536 (11th Cir. 1995), and voluntariness of consent is determined on the basis of the totality of the circumstances. Schneckloth, 421 U.S. at 227; Reynolds, 526 F. Supp. 2d at 1337. Relevant factors include the presence of coercive police procedures, the extent of the person's cooperation with the officer, the person's awareness of his or her right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found. Purcell, 236 F.3d at 1281.

Here, there is no indication that there was a language barrier as Sgt. Waller was able to converse with both Gonzales and Ibarra. [Doc. 344 at 65]. Gonzales was cooperative during the encounter, first telling Sgt. Waller that there was no contraband in the vehicle and, before Sgt. Waller even asked for consent, that "[Sgt. Waller] can check whatever [he] want[ed]." [Id. at 66]. After Sgt. Waller asked for consent to search the vehicle, Gonzales again stated, "Yes, search whatever you want."[14] Even after Gonzales told Sgt. Waller it was okay for him to search the vehicle, Sgt. Waller confirmed that he had received verbal consent from Gonzales. [Id.]. Sgt. Waller did not draw his weapon, did not make any threats or use any force, and in fact had no physical contact with Gonzales at all. [Id. at 94]. From the moment Sgt. Waller began interacting with Gonzales, he cooperated with Sgt. Waller, and during the search, neither Gonzales nor Ibarra voiced any objections, nor did Gonzales rescind the verbal consent. Gonzales does not contest any of these facts but simply claims that the purported consent "came at the 'heels' of an illegal arrest deemed as lack of probable cause [sic] and invalid traffic stop," and that "[t]he consent was given within ten minutes of the illegal seizure without the presence of [intervening] circumstances." [Doc. 357 at 9]. However, as stated, the initial traffic

_____

[14] Gonzales makes no argument regarding his education and intelligence, but the undisputed evidence shows that he understood what was being asked of him. [Doc. 344 at 65-67].

stop and seizure of Gonzales' person for the purpose of investigating the circumstances that came to Sgt. Waller's attention were not unlawful, and the subsequent consent was therefore not tainted.

Considering the totality of these facts and circumstances, and comparing this encounter to more coercive circumstances that have nonetheless been found to be consensual, the Court finds that Gonzales freely and voluntarily consented to a search of the tractor-trailer. See United States v. Hidalgo, 7 F.3d 1566, 1567, 1571 (11th Cir. 1993); Garcia, 890 F.2d at 361 (holding consent voluntary despite officers' refusal to accept suspect's conditional consent to search and threats to obtain a search warrant if suspect did not consent to a full search); United States v. Long, 866 F.2d 402, 404 (11th Cir. 1989) (holding consent voluntary where officers asked for consent to search, stating that, if refused, they would "dig the place up"); United States v. Espinosa-Orlando, 704 F.2d 507, 513 (11th Cir. 1983) (holding consent voluntary despite fact that individual was arrested at gunpoint, forced to lie on the ground, and provided consent while one officer had his weapon drawn). After Gonzales gave consent to search the tractor-trailer, Sgt. Waller located the suitcase under the tarp near the front of the trailer. Sgt. Waller asked Gonzales what was inside the suitcase, and Gonzales said a dead body. [Doc. 344 at 67]. Gonzales' answer provided Sgt. Waller further reason to continue his investigation and to open

the suitcase based on Gonzales' consent. United States v. Kapperman, 764 F.2d 786, 794 (11th Cir. 1985) (consent to search vehicle extended to opening luggage found in vehicle); United States v. Harris, 716 F. Supp. 1470, 1474-75 (M.D. Ga. 1989) (verbal consent to search vehicle encompassed opening travel bags found in trunk).[15]

## 2. Probable Cause to Search the Tractor-Trailer

The Court also finds that the warrantless search of the tractor-trailer and suitcase was supported by probable cause to believe they contained contraband. "The legality of a warrantless automobile search is based on the existence of probable cause to believe that the automobile is carrying contraband subject to forfeiture under the law, and the difficulties of securing a moveable vehicle while a warrant is obtained." United States v. Thomas, 536 F. Supp. 736, 742 (M.D. Ala. 1982). See also Chambers v. Maroney, 399 U.S. 42, 51-52 (1970); United States v. Alexander, 835 F.2d 1406, 1409 (11th Cir. 1988). Thus, a warrantless search of a vehicle is authorized where probable cause coupled with exigent circumstances is

---

[15] Gonzales summarily argues that the police failed to read him his Miranda warnings and never "avail[ed] themselves of the opportunity to obtain a search warrant given the fact that for almost two days police had intercepted wiretaps of phone calls related to this case and physically conducted continuous [surveillance] of defendant for almost a full day." [Doc. 357 at 10]; see Miranda v. Arizona, 384 U.S. 436 (1966). However, the police were not required to read Gonzales his Miranda warnings, since he was not under arrest and was therefore not interrogated in a custodial setting. [Doc. 344 at 81-82]. Moreover, as already stated, Sgt. Waller had Gonzales' voluntary consent to search the tractor-trailer and its contents and therefore was not required to obtain a warrant.

present.  Thomas, 536 F. Supp. at 742 (citing Coolidge v. New Hampshire, 403 U.S. 443, 458-64 (1970)).

Probable cause to search exists "'when the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband.'" Alexander, 835 F.2d at 1409 (quoting United States v. Clark, 559 F.2d 420, 424 (5th Cir. 1977))[16] (alteration in original).  In determining whether probable cause exists, the Court "may examine the collective knowledge of the officers 'if they maintained at least a minimal level of communication during their investigation.'" United States v. Olmedo, 552 F. Supp. 2d 1347, 1357 (S.D. Fla. 2008) (quoting United States v. Willis, 759 F.2d 1486, 1494 (11th Cir. 1985) (citation omitted)).  Exigent circumstances exist by the mere potential mobility of the vehicle.  United States v. Nixon, 918 F.2d 895, 903 (11th Cir. 1990) (the requirement of exigent circumstances is satisfied by the "ready mobility" inherent in all vehicles that reasonably appear to be capable of functioning).  "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."  United States v. Ross, 456 U.S. 798, 825 (1982).

---

[16] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

The collective knowledge of the participating law enforcement officers at the time of the traffic stop included the wiretap information detailing the transactions to take place, the use of coded language that the agents knew referred to the drug trade, the prior surveillance and seizure under similar circumstances, the surveillance of the tractor-trailer, the Impala, the white Chevy van, and the white pickup truck on April 21, including observing the suitcase being removed from the van that traveled from 3241 Hamilton Road to the warehouse and placed onto the flatbed trailer, and the continuous surveillance of the tractor-trailer until the time of the traffic stop, which provided probable cause to believe that on the evening of April 21, 2008, Temo and others were at the warehouse placing drug proceeds on the trailer and that the money in question would be found on the trailer on April 22.[17] Olmedo, 552 F. Supp. 2d at 1357; Alexander, 835 F.2d at 1409.

Under the totality of the circumstances, Sgt. Waller had probable cause to search the tractor-trailer and to seize the suitcase located within the truck. United States v. Pineda, No. 1:06-cr-350-WSD, 2008 WL 686239, at *10-11 (N.D. Ga. Mar. 10, 2008), adopted at *4 (finding collective knowledge of officers conducting wiretap surveillance of drug trafficking organization followed by the observations of

_____

[17] The exigency requirement is satisfied as the tractor-trailer had recently been observed in motion, therefore showing its mobility. See United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003) (mobility is satisfied merely if "the automobile is operational").

defendant actually engaging in activity expressed during the intercepted calls gave officers sufficient probable cause to search vehicle). See also United States v. Olvera, 178 Fed. App. 373, 374-75 (5th Cir. 2006) (*per curiam*) (unpublished) (finding wiretap surveillance and observations of suspect provided agents with probable cause to search vehicle, including any area where contraband could be found); United States v. Jackson, 548 F. Supp. 2d 1314, 1320-21 (M.D. Fla. 2008), adopted at 548 F. Supp. 2d at 1317 (probable cause to search vehicle existed based on the information learned through the wiretap and earlier surveillance confirming information); United States v. Lee, No. 1:06-CR-125(9), 2007 WL 1567098, at *11-12 (E.D. Tex. May 29, 2007), adopted at *1 (agents' knowledge, provided by intercepted calls, that truck drivers in tractor-trailers were utilized as couriers to distribute narcotics, coupled with agents' observation of duffle bags being placed in truck with call afterwards confirming "everything was cool," provided sufficient probable cause to believe defendant was transporting cocaine).[18]

---

[18] Gonzales argues that probable cause was lacking because the evidence was "indicative of mere presence at a crime scene and among criminal suspects and nothing more," and that the "record does not show that [Gonzales] loaded or saw the suitcase containing the money much less the contents inside the suitcase." [Doc. 357 at 4]. However, the focus of the inquiry is not on whether the defendants were aware that contraband was in the vehicle, but simply on whether the police had probable cause to believe that contraband was in the vehicle, which, as stated, has been established based on the collective knowledge of the agents in this case.

Gonzales cites <u>United States v. Virden</u>, 488 F.3d 1317, 1320-22 (11th Cir. 2007), [Doc. 357 at 4], in which the Eleventh Circuit held that officers lacked probable cause to seize the defendant's rental car after observing him exit the garage of a private residence, where the facts known were that the defendant left a location of suspected drug activity, appeared to have control over the garage because the garage door closed without anyone else being seen, and misstated to the police exactly where he had been. <u>Virden</u>, 488 F.3d at 1322. The Court finds that the facts known at the time the tractor-trailer was searched were stronger than those in <u>Virden</u>. As stated, the collective knowledge of the officers, including information gained from intercepted phone calls, surveillance on April 21 and 22 and observations of the driver of the tractor-trailer engaging in the activity expressed during the intercepted calls, and the suspicious behavior of the defendants, provided probable cause to believe that contraband would be found in the suitcase on the tractor-trailer, in contrast to the circumstances in <u>Virden</u> where officers had only seen the defendant leave a location of suspected criminal activity but had no other corroborating information.[19] Because

---

[19] Gonzales also cites <u>United States v. Boyce</u>, 351 F.3d 1102, 1109 (11th Cir. 2003), in which the Eleventh Circuit found that the officer's reliance on the defendant's supposed nervous behavior was belied by a videotape of the defendant during the encounter, which did not reflect such nervousness, and that the officer's testimony that he was suspicious because the defendant was traveling such a long distance to see an ex-girlfriend was not a reasonable basis for the search because the defendant was able to explain away the inconsistencies in his behavior and the reason for the travel. However, Gonzales presented no evidence to contradict or

the traffic stop was lawful and Sgt. Waller obtained consent to search, and because independent probable cause to search the tractor-trailer and suitcase existed, it is **RECOMMENDED** that Gonzales and Ibarra's motions to suppress, [Docs. 256 & 273], be **DENIED**.

## B.  Mora Quezadas and Martinez's Motions to Suppress, [Docs. 242 & 254]

At the outset of the initial evidentiary hearing on Mora Quezadas and Martinez's motions to suppress, the government challenged whether the defendants had standing to contest the search of 3241 Hamilton Road.  [See Doc. 358].  The parties presented evidence on the standing issue at both hearings, and Mora Quezadas and Martinez argue that they have shown that they had a subjective expectation of privacy in the residence, which was objectively reasonable.  [Doc. 368 at 4-5].  The government responds that defendants have not established a legitimate expectation of privacy because they were, at most, overnight guests at the residence for a commercial purpose instead of personal reasons.  [Doc. 377 at 10-13].

---

explain away Sgt. Waller's testimony about his or Ibarra's suspicious behavior. While Gonzales argues that his answers to Sgt. Waller's questions "were not shown to be false or deceitful or actual [misstatements]" and "reflect a trucker from another state who picks up a load and does not concern himself with what the load consists of," [Doc. 357 at 5], for the reasons discussed, the Court finds that the totality of the circumstances presented here provided probable cause to believe that the tractor-trailer was transporting contraband.

A defendant who challenges a search under the Fourth Amendment bears the burden of demonstrating a legitimate expectation of privacy in the area searched. United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998). A person has a legitimate expectation of privacy if (1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable. United States v. Segura-Baltazar, 448 F.3d 1281, 1286 (11th Cir. 2006). "A legitimate expectation of privacy [must] be proven by factors beyond mere possession, such as a right to exclude or a right to privacy." United States v. Espinosa-Orlando, 704 F.2d 507, 512 (11th Cir. 1983) (citing Rakas v. Illinois, 439 U.S. 128, 143-44 & n.12)).

While an overnight guest in a third party's home can have a legitimate expectation of privacy in the host's home, Minnesota v. Olson, 495 U.S. 91, 98 (1990), "the act of staying overnight at a third party residence does not automatically entitle a defendant to the protections of the Fourth Amendment." United States v. Hunt, No. 2:07-cr-284-WKW, 2008 WL 4080770, at *3 (M.D. Ala. Sept. 3, 2008); United States v. Puliese, 671 F. Supp. 1353, 1358-61 (S.D. Fla. 1987). Indeed, merely occupying a residence or room overnight does not establish a reasonable expectation of privacy in that place for Fourth Amendment purposes. United States v. McRae, 156 F.3d 708, 711 (6th Cir. 1998) (defendant did not have a legitimate expectation of privacy by virtue of having stayed a week in the vacant premises that he did not

own or rent); <u>United States v. Gale</u>, 136 F.3d 192, 196 (D.C. Cir. 1998) (defendant lacked legitimate expectation of privacy in apartment that he used or resided in without permission of its tenant).  Rather, a person claiming the protection of the Fourth Amendment in a third party's residence must prove that he was legitimately in the place searched.  <u>Rakas</u>, 439 U.S. at 143-44 & n.12 (suggesting that wrongful presence on property supports no reasonable expectation of privacy); <u>United States v. Armenta</u>, 69 F.3d 304, 308 (9th Cir. 1995) (no legitimate expectation of privacy where there was no identifiable "host" who could or did give defendant permission to stay at the house); <u>United States v. Gonzales-Barrera</u>, 288 F. Supp. 2d 1041, 1050 (D. Ariz. 2003) ("[A]n 'overnight guest' is more than someone who simply spends the night.  Such status is contingent on an invitation by an authorized host.").  Moreover, the Eleventh Circuit has held that an overnight guest must "prove that he was a guest for personal reasons, not for a commercial purpose."  <u>United States v. Bell</u>, 218 Fed. App. 885, 895 (11th Cir. 2007) (unpublished);[20] <u>United States v.</u>

_____

[20] Defendants argue that the portion of <u>Bell</u> in which the Eleventh Circuit, citing <u>Minnesota v. Carter</u>, 525 U.S. at 90-91, held that the an overnight guest must show that he is not using a residence primarily for commercial purposes in order to establish standing is dicta because the court had already found that the defendant did not have standing under <u>Rakas</u>, 439 U.S. at 134, since he had "expressly disclaimed a subjective expectation of privacy in the premises."  [Doc. 368 at 9 (<u>citing</u> <u>Bell</u>, 218 Fed. App. at 895)].  Defendants argue that the court's explanation of why Bell had not established standing as an overnight guest "only serves to further explain why the court rejected Bell's standing arguments and is not necessary to support the [c]ourt's opinion that *Rakas v. Illinois* controls."  [<u>Id.</u> at 9].  The Court

35

Cooper, 203 F.3d 1279, 1285 n.3 (11th Cir. 2000) (noting that defendants likely would lack standing as overnight guests because evidence suggested they were using the premises predominately to engage in drug trafficking).

The Court finds that defendants Mora Quezades and Martinez have failed to satisfy their burden of showing that they had a legitimate expectation of privacy in the residence at 3241 Hamilton Road. Defendants were not the owners of the residence, presented no evidence that they had the permission of the owner to reside at the residence, and had no idea how long they would be at the residence. [Doc. 358 at 15]. Mora Quezadas testified that he had another residence and that he was staying at 3241 Hamilton Road because he was going to be leaving the area soon to travel with his family. [Doc. 365 at 60-61]. Martinez averred that on May 13, 2008, he "resided" at 3241 Hamilton Road and had been a "resident" at that address for approximately one week. [Doc. 365, Def. Ex. 1]. Mora Quezadas testified that he did not have an agreement to pay rent, and there was no evidence that either defendant had a key to the residence or the right to exclude others. [Doc. 358 at 33]. Indeed, the evidence showed that they did not have access to certain parts of the residence

---

disagrees that this portion of Bell is mere dicta, but rather serves as a holding explaining why the defendant's argument that he had standing as an overnight guest failed. Defendants also argue that because Bell is unpublished, it may not be treated as binding precedent. [Doc. 368 at 5 (citing 11th Cir. R. 36-2)]. However, the opinion still serves as persuasive authority. See 11th Cir. R. 36-2.

and that other individuals were also inside the residence.  [Id. at 17, 23-26; Doc. 365 at 19-28, & Def. Exs. 2-21].

While defendants claim that they were overnight guests, they presented no evidence that anyone with authority to do so gave them permission to stay as guests in the residence, and the defendants have presented somewhat conflicting evidence as to their actual status, given Mora Quezadas' testimony that he had another residence and was staying at 3241 Hamilton Road until he left to travel, and Martinez's affidavit that he "resided" at the address for one week.  Absent evidence of an identifiable host who granted them permission to stay at the residence, defendants have not demonstrated that they were "guests."  The mere fact that they may have slept in the house, had some belongings and paperwork there, sometimes ate meals at the house and cooked in the kitchen, watched TV and played pool in the house, [Doc. 365 at 29-30, 33, 47-48, & Def. Exs. 2-21], does not establish that they were overnight guests.  Because defendants have not presented evidence that they were guests of a specific individual, they have "advanced no concrete foundation for standing."  Cooper, 203 F.3d at 1284-85.  Accordingly, Mora Quezadas and Martinez have not shown that they had a legitimate expectation of privacy in the residence as overnight guests.

Even if the Court found that the defendants were overnight guests in the residence, they have failed to show that they were there "for personal reasons, not for a commercial purpose." <u>Bell</u>, 218 Fed. App. at 895. The defendants presented no evidence about their purpose for staying at the residence, other than Martinez indicating that he was a resident for one week and Mora Quezadas stating that he was staying there before he left to travel with his family. On the other hand, the government presented evidence that the residence was used for drug trafficking and money laundering purposes. In fact, in view of the defendants' guilty pleas to Count 15, charging the cocaine seized at 3241 Hamilton Road on May 13, 2008, and their guilty pleas to Counts Three through Six and Fourteen, charging the money laundering transactions described in the evidence as having begun at 3241 Hamilton Road on April 8, April 16, April 18, and May 9, 2008, the evidence shows that Mora Quezadas and Martinez were using 3241 Hamilton for commercial, criminal purposes. Defendants argue that although there was evidence that 3241 Hamilton Road functioned as a "drug processing location," it also served as their residence. [Doc. 385 at 3]. However, because the evidence shows that 3241 Hamilton Road was being used "primarily for commercial" purposes, <u>Bell</u>, 218 Fed. App. at 896, the defendants had no reasonable expectation of privacy even if they were overnight guests in the residence. <u>Cooper</u>, 203 F.3d at 1285 n.3; <u>Puliese</u>, 671 F. Supp. at

1358-61.  It is therefore **RECOMMENDED** that Mora Quezadas and Martinez's motions to suppress, [Docs. 242 & 254], be **DENIED** based on their lack of standing.

**C.    Pelon's Motion to Suppress, [Doc. 257]**

Pelon seeks to suppress the fruits of the warrantless search of his residence, claiming it was conducted without his consent and without a warrant or probable cause or reasonable suspicion of wrongdoing.  [Doc. 257].  The government argues that Pelon's motion should be denied because agents entered the Sweetwater house to execute a valid arrest warrant and were lawfully inside the bedroom occupied by Pelon, where the four cell phones were found in plain view.[21]  [Doc. 301 at 9-15].

Although the principle intrusion against which the Fourth Amendment is aimed is physical entry into one's home, Payton v. New York, 445 U.S. 573, 585 (1980) (citation and quotations omitted), when law enforcement agents are armed with a valid arrest warrant, i.e., an arrest warrant founded upon probable cause, they possess the "limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."  Id. at 603.  In assessing whether law enforcement agents possessed lawful authority to enter a residence pursuant to a valid arrest warrant, courts inquire into two matters: first, whether

---

[21] The government adds that each of the four phones were viewed by officers while within the "grab area" of Pelon and were seized less than five minutes later pursuant to Pelon's lawful arrest.  [Doc. 301 at 14-15].

there existed a reasonable belief that the location to be searched was the suspect's dwelling; and second, whether the agents had "reason to believe" that the suspect was within the dwelling at the time of entry. United States v. Bervaldi, 226 F.3d 1256, 1263 (11th Cir. 2000); United States v. Magluta, 44 F.3d 1530, 1533 (11th Cir. 1995). All facts and circumstances within the knowledge of the law enforcement agents are relevant to this analysis and are viewed in their totality, and common sense factors guide the analysis. Bervaldi, 226 F.3d at 1263; Magluta, 44 F.3d at 1535.

Pelon does not contest that the government possessed a valid warrant for his arrest, nor does he contest the officers' entry into the Sweetwater house or their lawful presence in the bedroom on the morning of September 16. [Docs. 311 & 323 at 3]. Based on the evidence collected from surveillance and wiretaps, the agents possessed a reasonable belief that 1014 Sweetwater Road was Pelon's residence. Furthermore, the agents were justified in believing that Pelon would be at the residence on the morning of September 16, 2008, since his vehicle had been spotted there in the days leading up to the execution of the warrant and was parked there when agents arrived that morning, he was not known to have any employment that would involve him being away from the house at 8:30 a.m., and agents "may presume that a person is at home at certain times of the day – a presumption which can be rebutted by contrary evidence regarding the suspect's known schedule."

<u>Magluta</u>, 44 F.3d at 1535. While Pelon does not contest the agents' entry into his residence to execute the arrest warrant, he does object to the seizure of the cell phones from the bedroom.

### 1. The Cell Phones Were Found in Plain View

Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 375 (1993). Officers "may seize any contraband, including weapons, in plain view." <u>United States v. Purcell</u>, 236 F.3d 1274, 1277 (11th Cir. 2001). The theory of the plain-view doctrine is that "if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment–or at least no search independent of the initial intrusion that gave the officers their vantage point." <u>Dickerson</u>, 508 U.S. at 375. <u>See also</u> <u>Texas v. Brown</u>, 460 U.S. 730, 739-40 (1983) (contraband on car seat in plain view of officer who had stopped car and asked for driver's license properly seized); <u>O'Rourke v. Hayes</u>, 378 F.3d 1201, 1208 (11th Cir. 2004) (noting that no search, and thus no Fourth Amendment violation, occurred when an officer used his eyes in a place where the officer has the right to be). The doctrine, however, is limited in that officers must have probable cause to believe that

items in plain view are contraband before they may seize them.  See Arizona v. Hicks, 480 U.S. 321, 328 (1987).

As disussed, the DEA agents were lawfully present in the bedroom at the Sweetwater house pursuant to a valid arrest warrant.  Upon arresting Pelon, the agents saw four cell phones in the bedroom.  [Doc. 294 at 34, 38, 50].[22]  One phone was found lying on the night stand to the right of the bed, one was lying on the floor to the right of the bed, and two were lying on the floor to the left of the bed.  [Id. at 34-35].  Officer Krueger testified that when agents entered the room or took a few steps into the room, all four phones were visible to them.  [Id. at 35, 37, 47, 50].  Agents called out the fact that there were phones in the room, and Officer Krueger immediately recognized them as evidence of criminal conduct and understood their importance in a drug and wiretap investigation:

> I mean they're a phone group.  We're a phone group.  I mean the phones are a viable source of our intel, and during the course of various investigations or arrests, there's always a concerted effort by the part of the defendants many times to destroy the phones . . . .

[Id. at 35-36, 50].  Under these circumstances, in which the officers were lawfully present in the bedroom and immediately recognized the incriminating nature of the

---

[22] Pelon seeks to suppress a fifth cell phone found in the kitchen area, but the government is not seeking to introduce evidence related to this phone as it has no evidentiary value.  [Doc. 232 at 1 n.1].  Hence, Pelon's motion with respect to the fifth cell phone is moot.

cell phones in a drug investigation, it was reasonable to seize all four phones under the plain view exception to the warrant requirement. See United States v. Diaz, 494 F.3d 221, 226 (1st Cir. 2007) (affirming district court's denial of motion to suppress seizure of cell phone on the basis of the "plain view" exception); United States v. Santillan, 571 F. Supp. 2d 1093, 1100 -1101 (D. Ariz. 2008) (finding seizure of cell phone justified under plain view exception where "officers had good reason to believe the phone was being used in the furtherance of a drug-trafficking crime" and citing authority for proposition that "cell phones and pagers in drug-trafficking investigations may come within the plain view exception to the warrant requirement as items akin to contraband, in that they are often tools of the drug-trafficking trade.").

Pelon argues that the plain view exception does not apply because there were two individuals found in the bedroom, two cell phones were found on the side of the bed closest to Pelon, and the other two were on the opposite side of the bed. [Doc. 311 at 11]. Since there were two individuals in the bedroom, Pelon argues that the agents would not have known which cell phones belonged to which individual and that further examination would have to be done to determine the ownership. [Id.]. Since the female occupant of the bedroom was not arrested, Pelon argues that

it was "perfectly reasonable that the cell phones on the other side of the bed could be the property of the individual on the other side of the bed." [Id. at 11-12].

Pelon is attempting to place a higher burden on the government than is necessary for application of the plain view exception. Although the agents could not immediately ascertain whether all four cell phones *belonged* to Pelon, the phrase "immediately apparent" does not imply "that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." Texas v. Brown, 460 U.S. 730, 741 (1983). The police are required only to have probable cause to believe that the object they are viewing is contraband or evidence of a crime. Id. at 741-42; Hicks, 480 U.S. at 326; United States v. Smith, 459 F.3d 1276, 1290-91 (11th Cir. 2006). All four cell phones were found lying out in the open, and agents observed all four phones while they were in the room with Pelon and announced the presence of the phones while inside the bedroom, recognizing immediately their incriminating nature in the context of a drug trafficking wiretap investigation. [Doc. 294 at 35, 37, 47, 50].

## 2. The Cell Phones Were Seized Pursuant to Pelon's Lawful Arrest

The government also argues that the cell phones were seized incident to Pelon's lawful arrest because they were within his "grab area," and agents viewed all four cell phones during the "wingspan" search they performed upon encountering Pelon in the bedroom. [Doc. 301 at 14; Doc. 294 at 37]. Pelon argues

that the two cell phones seized from the opposite side of the bed from where he was located were not seized pursuant to the search incident to arrest exception because the search was not substantially contemporaneous with the arrest, the room was "wall to wall with a king sized bed," and the cell phones were "not within [his] immediate control." [Doc. 311 at 7-8].

"A search incident to arrest is always allowed of the suspect's person and the immediate area from which the suspect can grab a weapon or destroy evidence." United States v. Standridge, 810 F.2d 1034, 1037 (11th Cir. 1987). This exception extends to searches of "personal property such as a wallet found on the person of the arrestee." United States v. Richardson, 764 F.2d 1514, 1527 (11th Cir. 1985); United States v. Ricks, 817 F.2d 692, 696 (11th Cir. 1987) (quoting Chimel v. California, 395 U.S. 752, 763 (1969) (scope of search incident to arrest is limited to "grab area" within suspect's immediate reach, which "has been construed to mean 'the area from which [the defendant] might gain possession of a weapon or destructible evidence'") (alteration in original). Here, the unrefuted testimony demonstrates that all of the cell phones were within Pelon's "grab area." Pelon does not challenge whether the two cell phones on his side of the bed were within his potential control and "grab area" at the time of the arrest. [Doc. 323 at 6]. With regard to the other two phones in the bedroom, Pelon argues that based on Officer

Krueger's testimony, two of the cell phones were at least six feet away from Pelon. [Doc. 311 at 8]. However, agents did a quick "wingspan search," or protective sweep, of the area within Pelon's reach after breaking down the bedroom door, including the area under the bed. [Doc. 294 at 36-37].[23] Officer Krueger testified that during this search, all four phones would also have been visible to the agents as being within Pelon's "wingspan." [Id. at 37-38]. Officer Krueger also testified that Pelon could have grabbed or accessed all four of the phones from where he was situated when the agents found him, [id. at 35, 47], and Pelon has offered no evidence to the contrary. Hence, the cell phones were properly seized incident to Pelon's arrest. United States v. Finley, 477 F.3d 250, 260 (5th Cir. 2007) (upholding seizure and search of cell phone incident to a drug related arrest); United States v. Mendoza, 421 F.3d 663, 668 (8th Cir. 2005) (cell phone validly seized incident to lawful arrest); United States v. Reynolds, No. 3:08-CR-143, 2009 WL 1588413, *3 (E.D. Tenn. 2009) (five cell phones properly seized from defendant's car incident to his arrest where it was reasonable for the officers to believe that the cell phones might contain evidence of drug trafficking).

---

[23] A warrantless "protective sweep" of the apartment, upon entry to execute an arrest warrant, is allowed in circumstances such as those presented here. See Maryland v. Buie, 494 U.S. 325, 334 (1990); United States v. Delgado, 903 F.2d 1495, 1502 (11th Cir.1990) (citing Buie, 494 U.S. at 334); Magluta, 44 F.3d at 1538 (same).

Pelon also argues that the agents "knew that there were two individuals in the room," and "secured the area and then chose to search the room." [Doc. 311 at 9]. However, the evidence demonstrates that the agents observed the cell phones contemporaneously with encountering and arresting Pelon in the bedroom. Although Officer Krueger did not seize the phones right away, the main concern was to secure Pelon and anyone else who was hiding in the residence. [Doc. 294 at 49]. See United States v. Poole, 407 F.3d 767, 773 (6th Cir. 2005) (seizure of crack cocaine and razors on dresser near defendant after officer handcuffed defendant and secured other people in the room was search incident to arrest because dresser would have been within defendant's reach had he not been handcuffed). Even with this delay, the cell phones were seized within just five minutes of the agents entering the bedroom, which is "substantially contemporaneous" with the arrest. Shipley v. California, 395 U.S. 818, 819 (1969) (*per curiam*).

Pelon cites United States v. Noushfar, 78 F.3d 1442, 1448 (9th Cir. 1996), to argue that the search did not occur until after he and the other occupant of the bedroom were handcuffed and taken out of the bedroom, and that the search exceeded the scope of a protective search because the objectives of the arrest warrant had already been met. [Doc. 311 at 9-10]. However, as already stated and as the government points out, the "search" in this case did not take place after Pelon was

arrested, but "was contemporaneous with, and in fact simultaneous to, [Pelon's]

arrest," and the agents viewed the phones within Pelon's "grab area" just before

arresting him. [Doc. 323 at 7]. Thus, <u>Noushfar</u> is inapposite, since it involved agents

arresting the defendants within a minute of entering the apartment and then making

them sit in their living room while the agents searched the apartment for more than

half an hour. 78 F.3d at 1448.[24] Moreover, the fact that Pelon had been handcuffed

and removed from the bedroom when Officer Krueger retrieved the cell phones

does not preclude finding that the phones were seized incident to his arrest as many

courts "have recognized that even when an arrestee is handcuffed, a search of the

area that was within the defendant's immediate control when he was arrested is

---

[24] Likewise, Pelon's citation of <u>United States v. Cueto</u>, 611 F.2d 1056 (5th Cir. 1980), [Doc. 311 at 7], which held that a search of a room that the defendant had not been in when arrested and which occurred after the defendant was handcuffed and under arrest was not incident to arrest, is factually distinguishable. The "search" here occurred in the same room in which Pelon was arrested and was contemporaneous with agents performing the protective sweep and arresting Pelon. Pelon also cites <u>United States v. Strahan</u>, 984 F.2d 155, 159 (6th Cir. 1993) (where defendant was arrested 30 feet from vehicle, passenger compartment was not within defendant's "immediate control" at time of arrest and was illegally searched), and <u>United States v. Bonitz</u>, 826 F.2d 954, 956 (10th Cir. 1987) (case containing AR-15 rifle searched after defendant was handcuffed and in custody was not conducted in order to disarm defendant, protect safety of officers, or prevent destruction of evidence and was therefore improper). [Doc. 311 at 7]. Again, these cases are distinguishable as the undisputed evidence shows that the cell phones were within Pelon's "grab area" before he was arrested, and Officer Krueger's observation of the cell phones did not occur after Pelon was handcuffed and in custody but while Pelon was being arrested.

valid so long as it is conducted within a time span close to the arrest and while the defendant is still within the general proximity of the arresting officers." United States v. Massenberg, 45 Fed. App. 115, 120 (3d Cir. 2002) (citing Gov't of Virgin Islands v. Rasool, 657 F.2d 582, 585, 588-89 (3d Cir. 1981) (upholding search of automobile incident to driver's arrest after driver had been handcuffed but remained in the vicinity of the arresting officer); United States v. Turner, 926 F.2d 883, 887-88 (9th Cir. 1991) (upholding search of area of room in defendant's immediate control before his arrest, although defendant had been handcuffed and removed from room); United States v. Abdul-Saboor, 85 F.3d 664, 670-71 (D.C. Cir. 1996) (search upheld although defendant had been handcuffed and was outside bedroom in which he was arrested)). Therefore, it is **RECOMMENDED** that Pelon's motion to suppress, [Doc. 257], be **DENIED**.

# III. CONCLUSION

For the foregoing reasons and cited authority, the undersigned Magistrate Judge **RECOMMENDS** that Mora Quezadas and Martinez's motions to suppress, [Docs. 242 & 254], be **DENIED**, that Gonzales and Ibarra's motions to suppress, [Docs. 256 & 273], be **DENIED**, and that Pelon's motion to suppress, [Doc. 257], be **DENIED**.[25]

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 11th day of September, 2009.

_____
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

[25] As noted, defendant Tomas' motion to suppress, [Doc. 250], is deemed abandoned and withdrawn.